**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| **In re:** | ) | |
| | ) | **Case No. 23-10852 (KBO)** |
| **Legacy IMBDS, Inc., *et al.*,**[1] | ) | |
| | ) | **Chapter 11** |
| | ) | |
| **Debtors.** | ) | **(Jointly Administered)** |
| _____ | ) | |
| | ) | |
| **IV MEDIA, LLC,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Adv. Proc. No. 26-_____** |
| | ) | |
| **INVICTA WATCH COMPANY OF** | ) | |
| **AMERICA, INC., INVICTA MEDIA** | ) | |
| **INVESTMENTS, LLC, and THE HUB** | ) | |
| **MARKETING SERVICES, LLC,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| _____ | ) | |

**<u>COMPLAINT</u>**

Plaintiff IV Media, LLC, as assignee of iMedia Brands, Inc. (n/k/a Legacy IMBDS, Inc.) and its affiliates (the "**Plaintiff**" or "**IVM**"), for its Complaint against Defendants Invicta Watch Company of America, Inc. ("**Invicta**"), Invicta Media Investments, LLC ("**Invicta Media**"), The Hub Marketing Services, LLC ("**Hub**," and collectively with Invicta, Invicta Media, and Hub, the "**Defendants**"), alleges as follows:

---

[1] The debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are: ValueVision Media Acquisitions, Inc. (8670); Legacy IMBDS, Inc. (3770); ValueVision Interactive, Inc. (8730); Portal Acquisition Company (3403); VVI Fulfillment Center, Inc. (5552); ValueVision Retail Inc. (2155); JWH Acquisition Company (3109); PW Acquisition Company, LLC (0154); EP Properties, LLC (3951); FL Acquisition Company (3026); Norwell Television, LLC (6011); and 867 Grand Avenue, LLC (2642).

1

**INTRODUCTION**

1.      This is an action to hold the Defendants responsible for aiding and abetting breaches of fiduciary duty, civil conspiracy, unjust enrichment, and fraudulent transfers.  The Defendants were the beneficiaries of a wide-ranging pattern of self-dealing by certain directors of the Debtor iMedia Brands, Inc. ("**iMedia**", the "**Debtor**", or the "**Company**") which caused the Debtor to unnecessarily expend millions of dollars.  Through the control exerted by the Defendants and their principal Eyal Lalo ("**Lalo**"), the Defendants were able to reap cash, stock, and other benefits for the Defendants at the Debtor's expense.  The Defendants, who directly or indirectly held equity in iMedia, were able to use their positions of power and influence to cause iMedia to expend large amounts of cash while the Debtor was insolvent.  These transactions included the purchase of excessive goods and services from the Defendants and the use of valuable iMedia television broadcast time to market products which did not sell.  The Plaintiff brings this action to rectify the Defendants' wrongdoing.

**NATURE OF THE ACTION**

2.      This is an adversary proceeding to avoid and recover fraudulent transfers made by the Debtor to the Defendant under federal and state law, and to obtain damages for aiding and abetting breach of fiduciary duty, civil conspiracy, and unjust enrichment for Defendants' participation in schemes to divert assets from the Debtor.

3.      The Plaintiff seeks damages and punitive damages for Defendants' aiding and abetting of breaches of fiduciary duty, participation in a civil conspiracy, and unjust enrichment. The Plaintiff further seeks to avoid the transfers under 11 U.S.C. §§ 544 and 548 and applicable state law, and to recover such transfers under 11 U.S.C. § 550.

2

**JURISDICTION AND VENUE**

4. This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334.

5. Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

6. This adversary proceeding arises in and relates to the jointly administered chapter 11 cases of *In re Legacy IMBDS, Inc. et al (f/k/a iMedia Brands, Inc. et al.)*, Case No. 21-11548-JTD (the "**Bankruptcy Cases**") pending in the United States Bankruptcy Court for the District of Delaware (the "**Court**").

7. Pursuant to Local Rule 7008-1, Plaintiff consents to entry of final orders or judgment by the Bankruptcy Court.

**PARTIES**

8. The Plaintiff is a Michigan limited liability corporation.

9. The Plaintiff is the owner and holder of claims against the Defendants as a result of its acquisition of the assets of the Debtor pursuant to section 363 of the Bankruptcy Code and the *Order (I) Authorizing the Sale of Substantially All of the Debtors' Assets Free and Clear of All Encumbrances Other Than Assumed Liabilities; (II) Approving the Debtors' Entry Into the Asset Purchase Agreement; (III) Authorizing Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (IV) Granting Related Relief* entered on August 15, 2023 [Main Case D.I. 461] (the "**Sale Order**").

10. Defendant Invicta is a Florida corporation with a principal place of business at 3069 Taft Street (1 Invicta Way), Hollywood, FL 33021.  Invicta can be served with process care of its registered agent, Stephen S. Bodden, Esq., at 1688 Meridian Avenue, Suite 700, Miami Beach, FL 33139.

3

11.     Defendant Invicta Media is a Florida corporation with a principal place of business at 3069 Taft Street (1 Invicta Way), Hollywood, FL 33021.  Invicta Media can be served with process care of its registered agent, Stephen S. Bodden, Esq., at 1688 Meridian Avenue, Suite 700, Miami Beach, FL 33139.

12.     Defendant Hub is a Florida limited liability company with a principal place of business at 3069 Taft Street, Hollywood, FL 33021.  Hub can be served with process care of its registered agent, Stephen S. Bodden, Esq., at 1688 Meridian Avenue, Suite 700, Miami Beach, FL 33139.

13.     The Plaintiff brings this action against the Defendants for their role in causing the Debtor's demise.

14.     On June 28, 2023 (the "**Petition Date**"), each of the above-captioned debtors filed a voluntary petition in the Court for relief under chapter 11 of title 11 of the United States Code, as amended (the "**Bankruptcy Code**").

## FACTUAL BACKGROUND

### A.  The Debtor's Background

15.     The Debtor, together with its debtor and non-debtor subsidiaries, was an interactive media company whose businesses included home shopping networks.  The Debtor employed approximately 600 individuals as of the Petition Date, and together with its non-Debtor affiliates, employed approximately 700 individuals worldwide.  The Debtor's U.S.-based employees were located primarily in Eden Prairie, Minnesota (the location of the Debtor's corporate headquarters and broadcasting center), and Bowling Green, Kentucky (the location of the Debtor's principal distribution facility).

4

16. Prior to the Petition Date, the Company owned and operated a portfolio of entertainment, consumer brands, and media commerce businesses, each of which cross promoted and exchanged data with each other to optimize the engagement experiences for advertisers and consumers in the United States and Western Europe. The Company's portfolio included, among other things, entertainment business segments ShopHQ (the Company's flagship shopping network) and 1-2-3.tv (a German interactive media company), two consumer brands Christopher & Banks and J.W. Hulme Company, and media commerce business iMedia Digital Services.

17. Despite its sizable operations and debt structure, the Debtor's corporate governance was riddled with conflicts of interest. These conflicts included providing its largest vendors with seats on iMedia's board of directors.

18. Invicta's principal, Lalo, served on iMedia's board from 2019 through the Petition Date, and was the Vice Chair of the board. iMedia's May 18, 2022 proxy statement described Lalo as follows:

> Eyal Lalo, 47, has served as a member of the Board since September 2019 and as its Vice Chair since May 2019. He has been owner, Chief Executive officer and member of the board of directors of IWCA [i.e., Invicta], a designer and manufacturer of Invicta-branded watches and watch accessories, since 1996. Under Mr. Lalo's leadership, IWCA has been recognized for its vast amount of design and product innovations targeted to all demographics and age groups, and has developed a strong following from collectors worldwide. For over 20 years **Mr. Lalo has worked very closely with the Company to develop fundamental strategies to drive sales growth benefiting IWCA** and the Company. Through his service on the Board, his experience may now be applied to all product categories within our portfolio. Mr. Lalo was appointed to the Board in accordance with the terms of the common stock and warrant purchase agreement described under "Certain Relationships and Related Transactions." [Emphasis added.]

19. Lalo was, directly or indirectly, the largest shareholder in iMedia. Lalo personally held 467,722 shares of stock in iMedia.

5

**B. iMedia's Relationship with Invicta, Invicta Media, and Hub**

    **i. Invicta**

20.    Invicta, a manufacturer of watches, was iMedia's largest supplier, having had a relationship with iMedia for over a decade prior to the Petition Date. Invicta's product was largely branded as "Invicta" watches. However, during the years immediately prior to the Petition Date, the relationship with Invicta caused severe harm to iMedia.

21.    iMedia purchased entirely too much Invicta product from Invicta, not only causing it to expend excessive amounts of cash on goods that were not saleable but also causing iMedia to use valuable airtime through its ShopHQ business on marketing Invicta inventory. That airtime should have been used to market other products.

22.    iMedia made payments totaling not less than $7,001,003.44 to Invicta from October 15, 2020 through the Petition Date (together with all other transfers of cash or property to Invicta during the four years prior to the Petition Date, the "**Invicta Transfers**"). A listing of the currently known Invicta Transfers is attached hereto as Exhibit A.

23.    Despite the Debtor's financial problems in the lead up to bankruptcy, it continued to spend lavish amounts on their relationship with Invicta, which amounts did not have a positive impact on the Debtor's finances (as detailed below, the Debtor was never profitable).

24.    For example, the Debtor held its annual "Invicta Voyager Cruise" event from February 23, 2020 to March 4, 2020. The Company held this event, which included broadcasted shows from Florida and then a cruise ship, for several years. This was an unnecessary expense that was borne by the Company due to its insider relationship with Invicta and Lalo. The Company paid for all expenses of this event, including round-trip airfare, luxury accommodation, and the cruise fare for numerous employees and others.

6

25.     The Invicta relationship provided no value to the Debtor but instead significantly contributed to the Debtor's financial distress as the Debtor was forced, by Lalo, to continually acquire inventory that was not saleable or, alternatively, did not result in positive net income.

26.     The problems with excess Invicta-branded inventory became so acute that iMedia entered into an agreement with Retailing Enterprises, LLC ("**Retailing**") whereby Retailing would liquidate obsolete and outdated Invicta-branded inventory of the Debtor.[2]

27.     iMedia also incurred debt to Retailing relating to the "Invincible Guarantee" program, under which consumers could receive credit for trading in used Invicta watches.

28.     Further, iMedia was forced to provide third party logistic services and warehousing to Retailing.

29.     iMedia's relationship with Retailing was an additional drag on iMedia's finances and would not have existed had iMedia not purchased excess Invicta-branded inventory at the behest of Invicta and Lalo, who was conflicted due to his role as a director of iMedia and a director and officer of Invicta.

### ii. Invicta Media

30.     On February 5, 2021, iMedia completed the acquisition of a 51% stake in TheCloseout.com from an affiliate of Invicta, Invicta Media on February 5, 2021.

31.     iMedia contributed approximately $3.5 million in inventory to Invicta Media for this purchase (the "**Invicta Media Transfers**").  In exchange, iMedia received a controlling interest in an insolvent company, i.e. worthless shares of stock.

32.     Only a year later, iMedia shut TheCloseout.com down due to poor performance, thereby losing its entire investment.

---

[2] Retailing filed its own chapter 11 case in the U.S. Bankruptcy Court for the Southern District of Florida on May 30, 2023.

ACTIVE 718548684v2

33. This was yet another conflicted transaction that resulted in losses to iMedia.

### iii. Hub

34. Moreover, iMedia purportedly used Hub for "marketing services."  In reality, Hub is a limited liability company owned by Lalo whose operations were funded by iMedia.  The headquarters of Hub were within Invicta's headquarters, but iMedia paid Hub's operating expenses and received little, if any, benefits for those payments.

35. Hub was led by Lalo's sister, Gany Lalo Cohen ("**Cohen**").  Cohen was also the Chief Marketing Officer of Invicta.

36. iMedia made payments totaling not less than $665,000.00 to Hub from October 15, 2020 through the Petition Date (together with all other transfers of cash or property to Hub during the four years prior to the Petition Date, the "**Hub Transfers**", and collectively with the Invicta Transfers and the Invicta Media Transfers, the "**Transfers**").  A listing of the currently known Hub Transfers is attached hereto as Exhibit B.

37. The Hub Transfers were nothing more than a means to siphon cash from iMedia to benefit Hub's insiders, including Lalo and Cohen.

38. Lalo also caused iMedia to enter into transactions with another business owned by Cohen, i.e. Blue Stallion.  Blue Stallion is a brand that was featured on ShopHQ, offering products including body creams, candles, and home goods.  Upon information and belief, iMedia's transactions with Blue Stallion caused iMedia to suffer additional losses.

39. Invicta, Invicta Media, Hub, and Blue Stallion were means by which Lalo breached his fiduciary duties to iMedia through theft of corporate opportunities and illicit siphoning of cash and benefited the Defendants in the process.

8

40. The Transfers made to Invicta, Invicta Media, and Hub within the two years prior to the Petition Date shall be referred to herein as the "**Two Year Transfers**".

41. Any contractual or other obligations of the Debtor to make the Transfers shall be referred to herein as the "**Obligations**". If such Obligations were incurred within the two years prior to the Petition Date, they shall be referred to as the "**Two Year Obligations**".

42. Invicta engaged in channel stuffing, with iMedia as its victim. Invicta knew, or should have known, that iMedia was not able to sell the products that Invicta caused iMedia to buy.

43. This not only caused iMedia to expend funds on inventory that it could not sell (which funds should have been used elsewhere) but also caused iMedia to devote time and money to liquidating that unsaleable inventory at a loss.

44. This practice became particularly bad between 2021 and 2023, during which time the inventory on hand from these vendors increased fivefold. The following table reflects the inventories in January of each year.

| Year | Amount |
|------|--------|
| 2019 | $7,074,048 |
| 2020 | $7,535,067 |
| 2021 | $15,200,818 |
| 2022 | $27,381,468 |
| 2023 | $36,458,887 |

45. The timing of this increased inventory was not an accident. Lalo joined iMedia's board in May of 2019 and began to directly or indirectly acquire shares in or around that time. As

9

his control over iMedia increased, he caused it to acquire more and more of the Defendants' inventory, thereby enriching himself in the process and leaving iMedia holding the bag.

46.     Relative to the amounts that the Defendants were receiving from iMedia, the equity investments that Lalo had in iMedia was small (and his basis in the stock was very low due to stock grants).  Accordingly, the Defendants and Lalo had greater upside in forcing sales of inventory to iMedia than in potentially profiting from Lalo's equity investment in iMedia.

**C. Breaches of Fiduciary Duty by Lalo and Other Directors and Officers.**

47.     As a director of iMedia, Lalo owed iMedia fiduciary duties, including duties of care and loyalty, under Minnesota law.

48.     Lalo breached his fiduciary duties to iMedia by, without limitation, causing iMedia to purchase excessive amounts of Invicta branded inventory during time periods when iMedia could not afford to make such purchases and iMedia had no need for such a tremendous amount of Invicta branded inventory.  In addition to the purchases from Invicta, Lalo caused iMedia to purchase excessive (and unsaleable) inventory from other companies with which he was affiliated, including Famjams Trading LLC and Sterling Time LLC.

49.     Lalo also breached his fiduciary duties to iMedia by causing iMedia to make the Invicta Media Transfers and engage in conflicted business dealings with iMedia including transactions relating to Invicta, Invicta Media, Hub, Blue Stallion, Cohen, Famjams, and Sterling, as outlined above.

50.     Due to his conflicts of interest (as, without limitation, Lalo was engaged in business with iMedia and owed fiduciary duties to his own companies), Lalo is not entitled to the protection of the business judgment rule.

ACTIVE 718548684v2

### D. The Debtor's Financial Problems

51.    While the Debtor was never profitable, it began suffering financial difficulties in the 2019 timeframe.  These problems were exacerbated by the unnecessary insider transactions detailed herein.

52.    As consumers switched from shopping at home via television to online shopping, the Debtor's business suffered additional losses.

53.    The Company was called EVINE Live, Inc. until July 17, 2019, and the name change was related to the price of EVINE stock, which fell below $1.00 per share.

54.    The Company's finances continued to spiral downward even after the July 2019 name change.

55.    The Company suffered losses for years prior to the Petition Date.  The chart below reflects the net losses in the lead up to bankruptcy:

| Year | Net Loss |
|------|----------|
| 2019 | $56.3 million |
| 2020 | $13.2 million |
| 2021 | $23.03 million |
| 2022 | $54.08 million |
| 2023 (through June) | $117.52 million |
| **Total** | **$264.13 million** |

In fact, iMedia suffered net losses every year from 2009 through the Petition Date, *i.e.* it was never profitable during its time as a publicly traded company.

56.    The company's stock price similarly performed in an abysmal fashion.  In 2019, iMedia stock traded as low as 26 cents per share.

11

57.    According to its Form 10-K Annual Report filed on April 30, 2020, iMedia had to do a one-for-ten reverse stock split on December 11, 2019 to bring it "into compliance with the minimum bid price requirement for maintaining its listing on the Nasdaq Capital Market." In other words, iMedia's stock would have been delisted absent this drastic financial move.[3]

58.    By 2022, despite this reverse split, the share price was back below $1 per share, evidencing further value deterioration.

59.    A February 6, 2020 Form 8-K filed by iMedia refers to a January 31, 2020 commitment "to an organizational restructuring to improve the performance of ShopHQ's on-air programming and to accelerate the Company's return to profitability." This organizational restructuring included a "plan of termination under which the Company incurred approximately $2.1 million in charges, of which $1.9 million represents severance expenses."

60.    In March 2020, the Debtor conducted mass layoffs at its Minnesota headquarters and Kentucky distribution centers.

61.    Through these layoffs, the Debtor terminated one-third of its employees.

62.    To prop the Company up, iMedia borrowed additional funds beyond its asset-based credit facility through a variety of transactions including issuing notes and PIPE transactions.

E.    The Debtor's Insolvency

63.    The Debtor had been suffering financial distress for a long period of time and it was

---

[3] A financial reporter described this maneuver as follows:

> The vast majority of companies that use reverse splits have very low stock prices. These "penny stocks" have a generally terrible reputation in the market. Penny stocks tend to be seen as high-risk, and many have histories that market them as scams. They're typically tied to troubled or failing companies that have no real assets or unique qualities.

See https://www.kiplinger.com/investing/stocks/what-is-a-reverse-stock-split#:~:text=Is%20a%20reverse%20split%20good,that%20market%20them%20as%20scams .

ACTIVE 718548684v2

both balance sheet and cash flow insolvent in the years prior to bankruptcy.

64.    The Debtor was insolvent from at least 2019 forward as the value of its liabilities exceeded the value of its assets.

65.    On the Petition Date, the Debtor listed approximately $272.6 million in total assets and $373.7 million in total liabilities, showing a balance sheet deficiency of about $101 million.

66.    Even these Petition Date asset values were inflated as evidenced by, without limitation, the fact that IVM purchased substantially all of the Debtor's assets for a cash purchase price of $39.9 million.

67.    The low purchase price revealed the truth regarding the Debtor's balance sheet. The Debtor had been inflating its asset values for years in its financial statements.

68.    On January 28, 2023, a mere five months before the Petition Date and eight months before the Debtor sold substantially all of its assets for $39.9 million, the Debtor reported shareholders' equity of $17 million, with assets valued at $443.7 million and liabilities valued at $426.7 million.  The asset values in these financial statements were overstated.  This included a goodwill figure of $92.93 million, which was, in reality, valueless.  Given the August 2023 $39.9 million purchase price, the Debtor's reported asset values were grossly inflated.

69.    On January 29, 2022, the Debtor reported shareholders' equity of $69.3 million. The Debtor's asset values were overstated as they included goodwill of $99.05 million.  The Debtor's goodwill asset value, among other asset values, was heavily overstated and was, in reality, valueless particularly given that the Debtor had never been profitable.

70.    Despite the stated asset values in the Debtor's financial statements, substantially all of the Debtor's assets sold for $39.9 million in August 2023.[4]

---

[4] Indeed, WRNN made the initial "stalking horse" bid on the Debtor's assets for $37.188 million.

ACTIVE 718548684v2

71.     Accordingly, the Debtor's assets, at a fair valuation, were materially lower than historically stated in its balance sheets, including in 2019, 2020, 2021, 2022, and 2023.

**F.  The Debtor's Chapter 11 Filing and Sale of Assets**

72.     The Debtor filed its chapter 11 case, along with those of several affiliates on the Petition Date.

73.     On July 3, 2023, the Debtor filed the *Motion Pursuant to Sections 105, 363, and 365 of the Bankruptcy Code for Entry of an Order (I) Authorizing the Sale of Substantially All of the Debtors' Assets Free and Clear of All Encumbrances Other Than Assumed Liabilities; (II) Approving the Debtors' Entry into the Asset Purchase Agreement; (III) Authorizing Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (IV) Granting Related Relief* [Main Case D. I. 93] (the "**Sale Motion**").

74.     Pursuant to the Sale Motion, the Debtor sought to approve a sale of substantially all of the Debtor's assets to WRNN.

75.     Following an auction, the Plaintiff was named as the highest bidder.

76.     On August 15, 2023, the Court entered the Sale Order.

77.     Pursuant to the Sale Order, the Court approved the terms of the Asset and Equity Purchase Agreement [Main Case D.I. 461-1] (the "**APA**") between the Plaintiff and the Debtor and its debtor affiliates.

78.     Pursuant to the APA, the Debtor sold, transferred, and assigned, among other things, all of the Debtor's avoidance claims under the Bankruptcy Code and state law and other claims and causes of action, including the claims that are the subject of this litigation.  APA, § 2.01(n).

14

### G. Predicate Creditors

79.    At the time each of the Transfers was made, the Debtor had one or more creditors holding an allowable unsecured claim whose claim remains unpaid (each, a "**Predicate Creditor**").

80.    The Predicate Creditors include, without limitation, Aniview, Inc., Comcast Cable Communications, LLC, Iron Mountain Information Management, LLC, and Tata Consultancy Services Limited.

### COUNT I – AVOIDANCE OF ACTUAL FRAUDULENT TRANSFERS AND OBLIGATIONS UNDER 11 U.S.C. § 548(a)(1)(A)

81.    The Plaintiff incorporates by reference the allegations in paragraphs 1 through 80 above.

82.    The Two Year Transfers were made, and the Two Year Obligations were incurred, with actual intent to hinder, delay, or defraud creditors as evidenced by, without limitation, the following badges of fraud:

    a.  The Two Year Transfers and the Two Year Obligations were made while iMedia was insolvent.

    b.  The Two Year Transfers and the Two Year Obligations were made to insiders of the Debtor.

    c.  iMedia did not receive reasonably equivalent value for the Two Year Transfers and the Two Year Obligations.

    d.  The Two Year Transfers and the Two Year Obligations were concealed.

    e.  The Two Year Transfers and the Two Year Obligations were made while the Debtor were about to be, or were being, sued.

15

f. The Two Year Transfers and the Two Year Obligations were made shortly before or after a substantial debt was incurred.

83. With regard to the Invicta Transfers, Invicta Media Transfers, and Hub Transfers, Lalo (Invicta, Invicta Media, and Hub's direct or indirect principal) was an insider—serving on iMedia's board. The lack of reasonably equivalent value is also evidenced by the rejections of the contracts with Invicta in the bankruptcy [Main Case D.I. 966].

84. Each of the Defendants was an insider of iMedia as they were companies owned by Lalo, who was a director of Invicta and a person in control of the Debtor.

85. The Two Year Transfers and the Two Year Obligations are avoidable pursuant to 11 U.S.C. § 548(a)(1)(A).

## COUNT II – AVOIDANCE OF CONSTRUCTIVE FRAUDULENT TRANSFERS AND OBLIGATIONS UNDER 11 U.S.C. § 548(a)(1)(B)

86. The Plaintiff incorporates by reference the allegations in paragraphs 1 through 85 above.

87. As set forth in paragraphs above, iMedia made the Two Year Transfers to the Defendants.

88. iMedia received less than reasonably equivalent value for the Two Year Transfers and the Two Year Obligations.

89. As detailed in, without limitation, sections E and F of this Complaint, iMedia was insolvent at the time of the Two Year Transfers and the Two Year Obligations.

90. The Transfers are therefore avoidable under 11 U.S.C. § 548(a)(1)(B).

## COUNT III – AVOIDANCE OF ACTUAL FRAUDULENT TRANSFERS AND OBLIGATIONS UNDER 11 U.S.C. § 544(b) AND APPLICABLE STATE LAW

91. The Plaintiff incorporates by reference the allegations in paragraphs 1 through 90

ACTIVE 718548684v2

above.

92. Under 11 U.S.C. § 544(b)(1), Plaintiff may assert the rights of an unsecured creditor under applicable state law, including the Predicate Creditors.

93. Under the Delaware Uniform Fraudulent Transfer Act ("**DUFTA**"), a transfer made with actual intent to hinder, delay, or defraud creditors is avoidable. *See* 6 DE Code § 1304.

94. The Transfers were made by iMedia, and the Obligations were incurred, with actual intent to hinder, delay, or defraud creditors as evidenced by, without limitation, the following badges of fraud:

    a. The Transfers were made, and the Obligations were incurred, while iMedia was insolvent.

    b. The Transfers were made to, and the Obligations were incurred to, insiders of the Debtor as they were made to companies owned or controlled by Lalo.

    c. iMedia did not receive reasonably equivalent value for the Transfers and the Obligations as the goods and services allegedly provided in exchange were valueless.

    d. The Transfers and the Obligations were concealed.

    e. The Transfers were made, and the Obligations were incurred, while the Debtor was about to be, or was being, sued.

    f. The Transfers were made, and the Obligations were incurred, shortly before or after a substantial debt was incurred.

95. As set forth above, the Transfers and the Obligations were made with actual intent to hinder, delay, or defraud creditors as demonstrated by numerous badges of fraud including

ACTIVE 718548684v2

insolvency, transfers to insiders/their entities, and transfers for less than reasonably equivalent value.

96.     Therefore, the Transfers and the Obligations are avoidable under 11 U.S.C. § 544(b)(1) and DUFTA.

## COUNT IV – AVOIDANCE OF CONSTRUCTIVE FRAUDULENT TRANSFERS AND OBLIGATIONS UNDER 11 U.S.C. § 544(b) AND APPLICABLE STATE LAW

97.     The Plaintiff incorporates by reference the allegations in paragraphs 1 through 96 above.

98.     Under 11 U.S.C. § 544(b)(1), Plaintiff may assert the rights of an unsecured creditor under applicable state law, including the Predicate Creditors.

99.     Under DUFTA, a transfer is avoidable if made for less than reasonably equivalent value while the debtor was insolvent or if the Debtor rendered insolvent by the transfer. *See* 6 DE Code §§ 1304 & 1305.

100.    Here, the Debtor was insolvent at the time it made the Transfers and incurred the Obligations or was rendered insolvent by the Transfers and the Obligations

101.    As set forth above, the Debtor received less than reasonably equivalent value for the Transfers  and the Obligations as the goods and services allegedly provided in exchange for the Transfers were valueless.

102.    The Transfers and the Obligations are avoidable under § 544(b)(1) and DUFTA.

## COUNT V – RECOVERY OF AVOIDED TRANSFERS UNDER 11 U.S.C. § 550

103.    The Plaintiff incorporates by reference the allegations in paragraphs 1 through 102 above.

18

104.    The Defendants were each an initial transferee or a subsequent transferee of the Transfers that are avoidable pursuant to 11 U.S.C. §§ 544 and/or 548 as set forth above.

105.    Plaintiff is entitled to recover the Transfers from the Defendants pursuant to 11 U.S.C. § 550 as well as any subsequent transferees of the Defendants.

**COUNT VI – AIDING AND ABETTING BREACH OF FIDUCIARY DUTY**

106.    The Plaintiff incorporates by reference the allegations in paragraphs 1 through 105 above.

107.    Certain officers and directors of iMedia including, without limitation, Lalo owed fiduciary duties to iMedia and, while it was insolvent, to its creditors as well.

108.    These fiduciary duties required iMedia's officers and directors to act in good faith, with honesty in fact, with loyalty, in the best interests of iMedia.

109.    Motivated by their ownership and control of the transferee entities, Lalo sought to benefit the transferee entities by causing the Debtor to engage in the Transfers even though the Transfers were not in the best interest of the Debtor.  The Debtor received less than reasonably equivalent value in the Transfers and the Transfers were not entirely fair to the Debtor.  In approving and facilitating the Transfers, Lalo breached his fiduciary duties to the Debtor.

110.    Given Lalo's ownership and control of the transferee entities (Invicta, Invicta Media, and Hub), the Defendants knew about or were willfully blind to the breaches by Lalo.  The transferee entities nonetheless participated in the Transfers and provided substantial assistance to Lalo as he breached his fiduciary duties.

111.    As a direct result of the breaches of fiduciary duties by Lalo, the Debtor participated in the Transfers and suffered damages.

19

112. Given Lalo's intimate knowledge of iMedia, the conduct of Invicta, Invicta Media, and Hub was willful, malicious, and in deliberate disregard for the rights of iMedia and warrants punitive damages.

## COUNT VIII – CIVIL CONSPIRACY

113. The Plaintiff incorporates by reference the allegations in paragraphs 1 through 112 above.

114. Lalo breached his fiduciary duties to the Debtor by orchestrating the Transfers.

115. The Transfers were unlawful transfers of iMedia's assets.

116. Invicta, Invicta Media, and Hub worked with Lalo and/or others to breach their fiduciary duties to iMedia and accomplish the Transfers.

117. Overt acts in furtherance of the conspiracy include the benefits received by the Defendants, Lalo, and Cohen, including the execution and concealment of the Transfers.

118. iMedia and its creditors were harmed by the Transfers and the breaches of fiduciary duties.

119. Given Lalo's intimate knowledge of iMedia, the conduct of Invicta, Invicta Media, and Hub was willful, malicious, and in deliberate disregard for the rights of iMedia and warrants punitive damages.

## COUNT IX – UNJUST ENRICHMENT

120. The Plaintiff incorporates by reference the allegations in paragraphs 1 through ___ above.

121. Invicta, Invicta Media, and Hub received millions of dollars through the Transfers.

122. The Transfers were the product of breaches of fiduciary duties by Lalo, were for less than reasonably equivalent value, and unlawful.

20

ACTIVE 718548684v2

123.    It would be unjust or morally wrong to permit Invicta, Invicta Media, and Hub to keep the money they received in the Transfers.

124.    Equity requires that the Invicta, Invicta Media, and Hub not be permitted to retain the money they received in the Transfers.

### PRAYER FOR RELIEF

WHEREFORE, the Plaintiff respectfully requests that the Court enter judgment in its favor and against the Defendants as follows:

A.    Avoiding the Transfers pursuant to 11 U.S.C. §§ 544, 548, and DUFTA;

B.    Entering judgment against the Defendants for the value of the Transfers under 11 U.S.C. § 550;

C.    Awarding damages for aiding and abetting breach of fiduciary duty and civil conspiracy;

D.    Awarding punitive damages;

E.    Awarding pre- and post-judgment interest;

F.    Awarding costs, attorneys' fees where allowed, and such other and further relief as the Court deems just and proper.

Respectfully submitted this 31st day of January, 2026.

/s/ Dennis A. Meloro
Dennis A. Meloro (DE Bar No. 4435)
GREENBERG TRAURIG, LLP
222 Delaware Avenue, Suite 1600
Wilmington, Delaware 19801
Telephone: 302-661-7000
Facsimile:  302-661-7360
Email: melorod@gtlaw.com

and

21

ACTIVE 718548684v2

John D. Elrod (*pro hac vice* forthcoming)
GREENBERG TRAURIG, LLP
Terminus 200, Suite 2500
3333 Piedmont Road, NE
Atlanta, Georgia 30305
Telephone: (678) 553-2100
Facsimile: (678) 553-2269
Email: elrodj@gtlaw.com
*Counsel for the Plaintiff*

22